In The United States District Court
For The Northern District Of Illinois
Eastern Division

| | |
|---|---|
| U. S. CCOMMODITY FUTURES TRADING COMMISSION<br>Plaintiff,<br><br>vs.<br><br>RICHARD C. REGAN, and<br>PRO TRADING COURSE, LLC,<br><br>Defendants. | Civil No: 11-cv-08679<br><br>Honorable Judge James B. Zagel<br>Magistrate Judge Susan E. Cox |

**ORDER OF DEFAULT JUDGMENT FOR PERMANENT INJUNCTION AND OTHER ANCILLARY RELIEF AGAINST DEFENDANTS RICHARD C. REGAN AND PRO TRADING COURSE, LLC**

On December 7, 2011, Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") filed a Complaint against Richard C. Regan ("Regan") and Pro Trading Course, LLC ("PTC") (collectively "Defendants"), seeking injunctive and other equitable relief for violations of the Commodity Exchange Act ("Act"), as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C. §§ 1 *et seq.*, and the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. § 1.1 *et seq.* (2011).

Defendants were served pursuant to Fed. R. Civ. P. 4(e)(1), "by following state law for serving a summons in an action brought in courts of general jurisdiction ... where service is made." Defendants were served in La Jolla, California, therefore California law, which allows

substitute service, followed by mail service, was followed. *See*, California Code of Civil Procedure ("CCCP") 415.20(a) and (b). (Dkt. 8, 9).

Regan and PTC failed to plead or otherwise defend as to the complaint within the time permitted by Fed. R. Civ. P. 12(a)(1). On February 23, 2012, this Court entered a default against Defendants pursuant to Fed. R. Civ. P. 55(a). (Dkt. 13).

The Commission now moves for entry of default judgments finding that Regan and PTC are liable for each cause of action alleged in the Complaint and should be permanently enjoined from violating the Act. Plaintiff also requests that this Court enter an order assessing restitution and civil monetary penalties against Defendants.

This Court has considered the CFTC's Application for Default Judgment and Order for Permanent Injunction and Other Ancillary Relief Against Defendants and incorporated Memorandum of Law, the declarations and exhibits filed by Plaintiff, and all other papers filed herein, and being fully advised in the premises.

## FINDINGS OF FACT

**THE COURT FINDS:**

1.  This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), which authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

2.  Venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1(e) (2006), in that Regan and PTC transacted business in this district and the acts and practices in violation of the Act have occurred within this district.

3.  Service was effected upon Regan and PTC by delivering copies of the summonses and complaints to Regan's wife at the Regan's California residence on December 21, 2011, and on December 23, 2011, the summonses and complaints were mailed to Regan and PTC by first-class mail. (Dkt. 8, 9).

4.  Regan and PTC have failed to timely answer or otherwise defend the CFTC's Complaint within the time permitted by Fed. R. Civ. P. 12. Defendant Regan is not in the military service, nor is he an infant or incompetent.

5.  The allegations of the CFTC's Complaint are well-pleaded and hereby taken as true. This Order is supported by the following facts.

**Plaintiff**

6.  Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act, as amended by the CRA and the Dodd-Frank Act, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2011).

**Defendants**

7.  Richard C. Regan, who was a resident of Chicago, Illinois, during the time he operated PTC, is now residing in La Jolla, California. Regan has been a Commission registrant since 2006. Regan was listed as PTC's principal since February 5, 2009, and was registered as an associated person ("AP") of PTC from February 5, 2009 through March 1, 2010. During the relevant period, Regan controlled all aspects of PTC's operation and held himself out to the public as such.

8. Pro Trading Course LLC, is a Delaware limited liability company which maintained its principal place of business in Chicago, Illinois. Regan formed PTC on December 29, 2008, and PTC has been registered with the Commission as a CTA since February 5, 2009.

**Regan Is PTC's Control Person**

9. From February 2009 through approximately September 2010 (the "relevant period"), Regan, as PTC's sole principal, controlled all aspects of PTC's operation. In particular, Regan hired all PTC sales associates, reviewed and authorized all PTC promotional materials and sales solicitations, trained all sales staff, directed PTC's futures and forex proprietary training program, operated PTC's Virtual Trading Room ("VTR"), selected PTC's proprietary traders, set the profit levels for advancement as a PTC trader, and determined what percentage of profits generated by PTC's traders would be distributed to them. Additionally, Regan controlled PTC's bank account, opened all of PTC's trading accounts at registered futures commission merchants ("FCM's"), funded those trading accounts, gave PTC traders discretionary authority to trade sub-accounts of PTC's master trading accounts, determined the maximum position limits for PTC's traders, and approved daily, weekly and monthly loss limits for PTC's traders.

**PTC's Operation**

10. During the relevant period, PTC's business operation was focused in two primary areas: soliciting members of the public to enroll in its training program to eventually become PTC proprietary traders, and selling subscriptions to and operating the VTR. Because Regan was principally involved in operating the VTR during CME trading hours, Regan hired PTC sales associates to solicit prospective clients for its training program and prospective subscribers to the VTR.

4

11. At its inception, PTC employed two sales associates. Later, the firm employed as many as six sales associates. For most of the relevant period, PTC's sales associates worked from office space located in Chicago, Illinois. Regan supervised PTC's sales associates, including preparing and/or authorizing the promotional materials they distributed to prospective clients and prospective subscribers and he authorized the sales pitches they employed in their sales presentations.

12. To generate interest in PTC's proprietary training program, Regan or PTC's sales associates placed advertisements on Craig's List, among other internet websites, during the relevant period, seeking to hire "forex and futures traders for intraday trading positions" at PTC. Regan approved all PTC advertisements. While the Craig's List advertisement represented that "[o]ngoing training is done via shadowing the firm's senior traders," it did not disclose that PTC charged an "enrollment fee" in order to enroll in its training program and for selection as a proprietary trader. Because PTC advertised that it was hiring proprietary traders, its advertisements often attracted individuals who were unemployed and seeking gainful employment.

13. If an individual expressed an interest in PTC's proprietary training program, Regan or PTC's sales associates requested that the individual complete an application for the position of a PTC proprietary trader. PTC's application made it appear that PTC was "hiring" proprietary traders who would be "paid" by receiving a portion of the profits generated by their successful trading for PTC. In particular, PTC's application form sought information concerning an individual's trading experience, whether the individual was interested in trading futures or forex, how many hours the individual could devote to trading and whether the individual was "comfortable trading in a proprietary account with someone else's money." PTC's application

did not disclose that the applicant would be charged an enrollment fee in order to enroll in its training program and for selection as a proprietary trader.

14. Once an individual completed PTC's proprietary trader application, a PTC sales associate contacted the individual to schedule a telephone interview, which lasted approximately one hour. Typically, PTC's sales associates used the same format during their telephone interviews, which was approved by Regan. The interviews covered: PTC's training program, the qualifications of becoming a PTC trader, PTC's multiple trading level structure, advancement from one trading level to the next, the profit per level required for advancement in PTC's program, and the profit "payout" to the trader at each trading level, which was determined by Regan and defined as the "monthly percentage of cumulative net profits."

15. Only at the conclusion of the telephone interview did the sales associates inform the individual that PTC charged an enrollment fee to enroll in its training program. PTC charged enrollment fees ranging in price from $4,000 for training (including CDs and training manuals), access to the VTR and the opportunity to trade a PTC account for a three-month period, to $26,000 for training (including CDs and training manuals), access to the VTR, and the opportunity to trade a PTC account for a "lifetime," which was defined as "until Pro Trading Course, LLC becomes insolvent."

16. During the relevant period, PTC, through the efforts of Regan and its sales associates, solicited at least 126 clients who collectively paid PTC approximately $932,000 to enroll in its proprietary training program. Of the $932,000 in enrollment fees, at least $237,200 was paid to PTC by 27 clients for purposes of instruction on how to become successful PTC commodity futures proprietary traders and at least $694,800 was paid to PTC by 99 clients for purposes of instruction on how to become successful PTC forex proprietary traders. Of the

$237,200 paid to PTC by its commodity futures clients, PTC refunded approximately $5,000 to those clients who were not satisfied with the training program.

**PTC, through the Acts of Regan and Its Employees, Made Material Misrepresentations and Omissions Regarding the Success of PTC's Traders**

17. When soliciting individuals to enroll in its proprietary training program, PTC's sales associates misstated material facts and omitted material facts in their sales solicitations, which were prepared and/or authorized by Regan. In particular, during the relevant period, PTC's sales associates gave PTC's prospective clients the false impression that clients who completed PTC's training program and became traders routinely met the monthly profit targets set by PTC, advanced to progressively higher trading levels by meeting those profit requirements, and by doing so, received large profit distributions from PTC.

18. In connection with the telephone interview described in Paragraphs 14 and 15 above, PTC's sales associates typically sent a set of PTC's promotional materials, including a PowerPoint presentation, to prospective clients by facsimile or email. These promotional materials included two "Payout Charts" prepared by Regan for futures and forex traders, respectively, depicting the cumulative profit requirements for advancement to each trading level in PTC's multi-level structure, and monthly profit targets for each trading level. The "Payout Charts" identified ten or more levels from "futures trader" to "pro futures trader" to "senior futures trader," specifying progressively higher cumulative profits to advance from one level to the next. According to the charts, commodity futures traders could advance from level 1 to level 2 by earning cumulative nets profits of as little as $2,000. Regan periodically amended the profit requirements for each trading level and the monthly profit targets for each trading level. When soliciting prospective clients, PTC's sales associates represented that the profit requirements set by Regan for advancement to each trading level were "realistic" and attainable.

19. The Payout Charts that PTC's sales associates sent to prospective clients also depicted the "payout" to PTC's proprietary traders, which was defined as the monthly percentage of cumulative net profits paid to the trader. For example, the futures chart depicted a monthly payout of 65% to 75% of the cumulative net profits earned trading PTC's commodity futures accounts.

20. Regan made misrepresentations and omissions knowingly or recklessly because he knew that not one of the 126 clients who completed PTC's training and became PTC proprietary traders ever advanced beyond Level 1 of the program during the relevant period. In particular, Regan knew that PTC's commodity traders failed to earn cumulative net profits of at least $2,000 required for advancement to a Level 2 Futures Trader. Notwithstanding the forgoing, Regan and the sales associates whom he supervised failed to disclose to prospective PTC clients that after completion of PTC's training program, no PTC trader ever advanced beyond Level 1, and that no PTC trader ever met the monthly profit targets set by Regan or received profit "payouts" approximating those depicted on the "Payout Payout Charts" Regan prepared.

**The Actual Performance of Sub-Accounts Traded by PTC's Commodity Traders**

21. Between approximately March 2009 and July 2009, Regan, as PTC's control person, opened three commodity futures trading accounts in PTC's name at three registered FCMs. These trading accounts were funded with a portion of the enrollment fees PTC received from its clients.

22. Regan opened the commodity futures trading accounts described in Paragraph 21 above as master trading accounts in PTC's name. PTC gave its proprietary traders discretionary authority to trade sub-accounts of PTC's master commodity futures accounts. If a PTC

proprietary trader stopped trading the sub-account assigned to him, because he either exceeded the trading loss limits set by PTC or because his enrollment as a PTC trader was for a limited duration, the sub-account could be assigned to a new trader.

23. During the period March 2009 to June 2010, the 36 commodity futures sub-accounts traded by PTC's proprietary futures traders at the three registered FCMs collectively incurred cumulative net losses of approximately $78,569, and no sub-account earned any cumulative net profits.

24. Since Regan controlled all of PTC's commodity futures accounts referenced in Paragraphs 21 through 23 above, Regan knew the actual trading performance of PTC's commodity futures traders and, in particular, that none of them ever earned the level of profits required for advancement to a Level 2 futures trader or met the monthly profit targets depicted on PTC's "Payout Charts."

**PTC, through the Acts of Regan and Its Employees, Made Material Misrepresentations and Omissions Regarding PTC's Virtual Trading Room**

25. PTC, through Regan and its sales associates, solicited members of the public to subscribe to PTC's VTR, which PTC's promotional materials and sales solicitations described as a "trade room" operated by Regan and his team of purportedly elite traders from the floor of the CME during trading sessions. PTC's clients were granted access to the VTR as part of the enrollment fee they paid to PTC. Subscribers to the VTR typically paid PTC monthly fees ranging from $99 to $499. Both subscribers and clients gained access to the VTR from remote locations via computer connections and receipt of "access codes" provided by PTC.

26. In their sales solicitations and in promotional material distributed to prospective clients and prospective subscribers, Regan and PTC's sales associates created the false impression that Regan and his trading team were actually placing trades for PTC's accounts

9

during their VTR sessions. In particular, PTC's promotional materials stated that Regan and his team "make live trading calls, from the floor at the CME Group in Chicago. As they trade, they are calling trades, [and] advising on the markets … ."

27. Regan and PTC's sales associates routinely recommended that PTC's proprietary traders place the same commodity futures trades that Regan was purportedly placing during his trading sessions in the VTR, in order to maximize their own profits and advance to progressively higher trading levels.

28. In particular, from at least February 2009 through approximately September 2010, Regan knew that he and his trading team did no actual trading in the VTR, and, instead, placed only simulated trades while conducting VTR sessions. Notwithstanding the foregoing, Regan and PTC's sales associates knowingly or recklessly failed to disclose to PTC's prospective clients and clients and prospective subscribers and subscribers that Regan and his team were not placing any actual trades during their trading sessions in the VTR.

## CONCLUSIONS OF LAW

29. From at least February 2009 through approximately September 2010, PTC acted as a CTA in that, for compensation or profit, it engaged in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market or derivatives transaction execution facility, or for compensation or profit, and as part of a regular business, issued or promulgated analyses or reports concerning any of the activities referred to above.

30. From at least February 2009 through approximately September 2010, PTC, through its control person, Regan, and its employees, violated Section 4$o$(1)(A) and (B) of the

Act, 7 U.S.C. § 6o(1)(A) and (B), in that, while acting as a CTA, and by use of the mails or any means or instrumentality of interstate commerce, it directly or indirectly employed a device, scheme, or artifice to defraud any client or prospective client, or has engaged in transactions, practices or a course of business which operated as a fraud or deceit upon such persons. The devices, schemes, artifices, transactions, practices or courses of business included, but were not limited to: i) using false and misleading promotional material and sales solicitations which overstated the advancement opportunity and profit potential of the commodity futures training program PTC was selling, while failing to disclose that no PTC commodity futures trader ever advanced beyond Level 1 of the program or received monthly profit "payouts" approximating those depicted on its "Payout Charts," after completing PTC's training program; ii) using false and misleading promotional material and sales solicitations in selling the VTR, which represented that the trading Regan and his team conducted in VTR sessions was actual commodity futures trading, while failing to disclose that Regan and his team conducted only simulated trading in their VTR sessions; and iii) using false and misleading advertisements which represented that PTC was hiring commodity futures traders, while failing to disclose that PTC charged enrollment fees for its training program and never hired any applicant, after completion of its training program. PTC engaged in these fraudulent acts, misrepresentations and omissions in order to convince members of the public to enroll in PTC's commodity futures proprietary training program and/or to subscribe to PTC's VTR.

31.    From at least February 2009 through approximately September 2010, Regan and PTC, through its control person, Regan, and its employees, violated Commission Regulation 4.41(a), 17 C.F.R. § 4.41(a) (2011), in that, while acting as a CTA, and a principal of a CTA, Defendants advertised in a manner which employed a device, scheme or artifice to defraud

clients or prospective clients or involved transactions, practices or a course of business which operated as a fraud or deceit upon any such persons, including, but not limited to, the fraudulent acts described in Paragraph 30 above.

32. The acts and omissions engaged in by Regan were done knowingly or with reckless disregard for the truth.

33. Regan controlled PTC and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting PTC's violations alleged in this count. Regan is thereby liable for PTC's violations of Section 4$o$(1)(A) and (B) of the Act, 7 U.S.C. § 6$o$(1)(A) and (B), and Commission Regulation 4.41(a), 17 C.F.R. § 4.41(a) (2011), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

34. The foregoing acts, misrepresentations, omissions, and failures of Regan and PTC's employees described above occurred within the scope of their employment with Defendant PTC; therefore, PTC is liable for these acts in violation of the Act, pursuant to Section 2(a)(1)(B) of the Act, to be codified at 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

**Need for Permanent Injunction and Other Ancillary Equitable Relief**

35. Plaintiff has made a showing that Defendants Regan and PTC have "engaged, are engaging, or are about to engage in acts and practices in violation of the Act and Commission Regulations." Notwithstanding their default, the totality of the circumstances establish that, unless restrained and enjoined by this Court, there is a reasonable likelihood that Defendants will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

## ORDER OF PERMANENT INJUNCTION

**IT IS HEREBY ORDERED** that Regan and PTC, their officers, agents, servants, employees, attorneys and all other persons who are in active concert with them are permanently restrained, enjoined and prohibited from: i) acting as a CTA and using the mails or any means or instrumentality of interstate commerce, to directly or indirectly employ a device, scheme, or artifice to defraud any client or prospective client, or engage in transactions, practices or a course of business which operate as a fraud or deceit upon such persons, in violation of Section 4$o$(1)(A) and (B) of the Act, 7 U.S.C. § 6$o$(1)(A) and (B); and ii) advertising in a manner which employs a device, scheme or artifice to defraud clients or prospective clients or involves transactions, practices or a course of business which operate as a fraud or deceit upon any such persons, in violation of Commission Regulation 4.41(a), 17 C.F.R. § 4.41(a) (2011);

**IT IS FURTHER ORDERED** that Defendants are permanently enjoined and prohibited from engaging, directly or indirectly, in:

    1. Trading on or subject to the rules of any registered entity, as that term is defined in Section 1a of the Act, to be codified at 7 U.S.C. § 1a;

    2. Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Commission Regulation 1.3(hh), 17 C.F.R. § 1.3(hh) (2011)) ("commodity options"), securities futures products, and/or foreign currency (as described in Sections 2(c)(2)(B) and/or 2(c)(2)(C)(i) of the Act, as amended, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts"), for their own personal account or for any account in which they have a direct or indirect interest;

    3. Having any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts traded on their behalf;

    4. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts;

5. Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts;

6. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Commission Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011), and/or;

7. Acting as a principal (as that term is defined in Commission Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2011)), agent or any other officer or employee of any person (as that term is defined in Section 1a of the Act, as amended, 7 U.S.C. § 1a) registered, exempted from registration or required to be registered with the Commission except as provided for in Commission Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011);

## MONETARY SANCTIONS

**Restitution**

1. Defendants' violations of the Commodity Exchange Act merit the award of restitution to PTC commodity futures clients defrauded by Defendants. Defendants shall pay restitution in the amount of $232,200, plus post-judgment interest (the "Restitution Obligation"). Defendants are jointly and severally liable for payment of the Restitution Obligation.

2. Post-judgment interest shall accrue commencing on the date of entry of this Order and shall be determined by using the United States Treasury Bill rate prevailing on that date pursuant to 28 U.S.C. § 1961.

**Civil Monetary Penalty**

5. Defendants shall pay to the CFTC a civil monetary penalty in the amount of $461,100, plus post-judgment interest (the "CMP Obligation"). Defendants are jointly and severally liable for payment of the CMP Obligation.

6. Post-judgment interest shall accrue on the CMP Obligation commencing on the date of entry of this Order and shall be determined by using the United States Treasury Bill rate prevailing on that date pursuant to 28 U.S.C. § 1961.

C.  **Payment Procedures, Priority of Monetary Sanctions and Partial Payments**

7.  To effect payment by Defendants and the distribution of restitution, the Court appoints the National Futures Association ("NFA") as Monitor. The Monitor shall collect restitution payments from Defendants, and make distributions as set forth below. Because the Monitor is not being compensated for these services, and these services are outside the normal duties of the Monitor, it shall not be liable for any action or inaction arising from their appointment as Monitor, other than actions involving fraud.

8.  Defendants shall make their required restitution payments under this Order in the name of "Regan/PTC – Restitution Fund" and shall send such restitution payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover of a letter that identifies the paying Defendant and the name and docket number of the proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to (a) Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581, and (b) Chief, Office of Cooperative Enforcement, Division of Enforcement at the same address.

9.  The Monitor shall oversee Defendants' Restitution Obligation, and shall have the discretion to determine the manner for distribution of funds in an equitable fashion to PTC clients, or may defer distribution until such time as the Monitor may deem appropriate. In the event that the amount of restitution payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative costs of making a restitution distribution is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary

penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth in paragraph 11 below.

10. Defendants shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial institution wherever located, in order to make partial or total payment toward the Restitution Obligation.

11. Defendants shall pay their CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

Commodity Futures Trading Commission
Division of Enforcement
Attn: Accounts Receivables- AMZ 340
DOT/FAA/MMAC
6500 S. MacArthur Blvd.
Oklahoma City, OK 73169
Telephone: (405) 954-5644

If payment is to be made by electronic funds transfer, Defendants shall contact Linda Zurhorst or her successor at the above address to receive payment instructions and shall fully comply with those instructions. Defendants shall accompany payment of the CMP Obligation with a cover letter that identifies them and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to: a) the Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1151 21st Street, NW, Washington, DC 20581; and b) the Chief, Office of Cooperative Enforcement, Division of Enforcement, at the same address.

12. To the extent that any funds accrue to the U.S. Treasury as a result of the Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth in paragraph 9 above.

13. Any acceptance by the Commission and/or the Monitor of partial payment from Defendants of the Restitution Obligation and/or CMP Obligation shall not be deemed a waiver of Defendants' obligation to make further payments pursuant to this Order, or a waiver of the Commission's and/or Monitor's right to seek to compel payment from Defendants of any remaining balance.

14. Defendants shall not transfer, or cause others to transfer, funds or other property to the custody, possession, or control of any members of their family or any other person or entity for the purpose of concealing such funds from this Court, the Commission, or the Monitor until the Restitution Obligation and the CMP Obligation set forth above have been satisfied in full.

15. All notices required by this Order shall be sent by certified mail, return receipt requested. Notices to the CFTC shall be sent to the Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581. Defendants shall provide the CFTC with written notice of all changes to their contact telephone number(s) and/or mailing address(es) within ten (10) calendar days of the change(s).

16. This Court shall retain jurisdiction of this cause to assure compliance with this Order, the Restitution Obligation and for all other purposes related to this action. This Order shall be interpreted and enforced according to the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Northern District of Illinois, Eastern Division,

and all provisions of the Act and Commission Regulations relating or referring to the obligations hereunder.

17. There being no just cause for delay, the Clerk of the Court shall enter final judgment against Regan and PTC in this action forthwith and without further delay. There being no pending matters remaining in this matter, the case may be closed.

DONE AND ORDERED this 29th day of May, 2012.

_____
James B. Zagel
United States District Judge